CYTONA N. HOWLETT                                    PLAINTIFF

v.                                    CIVIL ACTION NO. 3:13-CV-744-DW

COMMISSIONER OF SOCIAL SECURITY                      DEFENDANT

## <u>MEMORANDUM OPINION</u>

Plaintiff Cytona N. Howlett has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain

judicial review of a final decision of the Commissioner of Social Security that denied her

application for supplemental security income (SSI).  Howlett applied for SSI on June 28, 2010,

alleging that she was disabled as of March 1, 2010, due to depression, post-traumatic stress

disorder (PTSD) and scoliosis of the spine (Tr. 91-100).  The Commissioner denied Howlett's

claims on initial consideration (Tr. 115-118) and on reconsideration (Tr. 120-122).  Howlett

requested a hearing before an Administrative Law Judge (ALJ) (Tr. 123-125).

ALJ John R. Price conducted a hearing in Louisville, Kentucky, on Feb. 9, 2012 (Tr. 32-

74).  Howlett attended with her attorney, Alvin Wax (Tr. 32).  Howlett and vocational expert

(VE) Gail Franklin testified at the hearing (Tr. 36-66, 67-74).  Following the conclusion of the

hearing, ALJ Price entered a hearing decision on March 6, 2012, that found Howlett is not

disabled for the purposes of the Social Security Act (Tr. 19-28).

In his adverse decision, ALJ Price made the following findings:

1.    The claimant has not engaged in substantial gainful activity since June 28, 2010,
      the application date (20 C.F.R. 416.971, *et seq*.).

2.    The claimant has the following severe impairments: mood disorder and the back
      strain (20 C.F.R. 416.920(c)).

3.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

4.	After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except she is able to stand and walk only 4 hours and sit for 6 hours in an 8-hour workday.  She is able to occasionally bend and stoop.  Due to mental impairments, she is limited to simple, one-to-two step, job tasks in an object focused work setting that is low stress with little to no change and no production quota.  She may have occasional contact with supervisors or co-workers, but no close tandem work and no contact with the general public.

5.	The claimant is unable to perform any past relevant work (20 C.F.R. 416.965).

6.	The claimant was born on July 19, 1989, and was 20 years-old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. 416.963).

7.	The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 416.964).

8.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, App. 2).

9.	Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 416.969 and 416.969(a)).

11.	The claimant has not been under a disability, as defined in the Social Security Act, since June 28, 2010, the date the application was filed (20 C.F.R. 416.920(g)).

(Tr. 21-28).  Howlett sought review of the hearing decision by the Appeals Council (Tr. 14-15).

The Appeals Council denied her request for review, finding no reason under the Rules to review

ALJ Price's decision (Tr. 1-6).  The present lawsuit followed.

**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.  20 CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities.  See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if

the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix.  *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989).  A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3)  The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience.  See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999).  Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g).  The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard.  *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528

(6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.).  Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*).  It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000).  So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion.  *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989).  The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Background Information.**

Howlett was born on July 19, 1989, and was 20 years and 7 months old at the alleged onset of her disability (Tr. 91, 134).  She stands 5'3" tall with a reported weight of 124 lbs (Tr. 91).  At the time she applied for SSI, Howlett was homeless with her sole income being a

monthly child support payment for her daughter (Tr. 135-136). Her work history prior to the alleged onset of her disability included employment as a banquet server, a janitor, and a package handler (Tr. 165-168). She ceased employment, according to her hearing testimony, as a result of chronic back pain,[1] which Howlett treated with physical therapy and Ibuprofen (Tr. 36-37). Howlett explained that her pain is experienced daily in the middle part of her back (Tr. 38). While Ibuprofen reduces her discomfort, the pain remains at a reduced level (Tr. 39). She occasionally wears a back brace and uses Icy Hot for this discomfort (Tr. 42).

Due to her pain, Howlett has reduced her physical activities. She only cleans her home, a third-floor apartment, once a week. She no longer takes her daughter on walks in the park and cannot reach above her shoulder without experiencing pain (Tr. 40). Howlett estimated that she can stand for 30 minutes before experiencing pain.(Tr. 41).

Howlett testified that she graduated from high school (Tr. 45). She also attended Spencerian College for several months on two occasions (Tr. 45-46). She had hoped to attend Jefferson Community College, as well, but the administrative requirements for admission were too difficult for her too meet (Tr. 46).

Howlett testified that after the alleged onset of her disability she worked briefly for a temporary service that placed her with Audubon Hospital where she worked as a dietary aide delivering meals (Tr. 46-47). Howlett also, through the same temporary service, worked briefly at several local hotels on a part-time basis, approximately two days a week in order to pay for her daughter's Christmas (Tr. 47-48). She estimated that she did such part-time work for a few months (Tr. 48).

_____

[1] Howlett advised Nurse Practioner Kathy Brotzge during a psychiatric evalutation at Seven Counties Services on January 4, 2010 that she left her employment with UPS "because she did not have transportation to get to work." (Tr 279).

Howlett has been treated for emotional problems at Seven Counties Services (Tr. 49, 303-329). She admits that on occasion she missed scheduled appointments there due to transportation problems (Tr. 49). While Howlett does have a driver's license, she does not own an automobile (Tr. 51). When she does drive, she drives a friend's automobile (Tr. 51). Howlett concedes that after her initial evaluation at Seven Counties in January of 2010, she did not return for a number of months because she was not "ready to talk." (Tr. 54-55).

Her mental health treatment at Seven Counties has been helpful according to Howlett (Tr. 51). She explained, however, that she is still depressed and her mind races, but she is now able to sleep through the night (Tr. 51). Nevertheless, she remains depressed with anxiety and irritation (Tr. 52). Sometimes she has difficulty controlling her anger and avoids being around people (Tr. 52-53). She does have a friend that she talks with on the phone (Tr. 53) Howlett explained that she spends most of her days listening to music and reading books (Tr. 56-57). She is able to grocery shop and prepares microwave food for herself and her daughter when her mother does not bring them fast food (Tr. 57-58). She goes to church on Sundays and to the public library occasionally (Tr. 61).

Howlett testified on examination by counsel that she still will occasionally hear voices, several times a week, even when she is on medication (Tr. 63). She also has difficulty concentrating when she reads (Id.). Howlett writes down all of her appointments since she has trouble remembering things (Tr. 64). She experiences flash backs and nightmares, which the record indicates are due to the psychological abuse previously inflicted in her mid-teens by her alcoholic father and her victimization from being raped on several occasions when she was 16 years old. (Tr. 264-65, 170-71, 296). Howlett was previously treated at Seven Counties Services when she was 13 or 14 years old as well (Tr. 66). On that occasion, she was treated with Ritalin

(Id.).  Howlett admits that despite treatment she has never liked being around people, who in her words "irritate" her (Id.).

A review of the medical records shows that Howlett received a psychiatric evaluation by Nurse Practitioner Kathy Brotzge of Seven Counties Services on Jan. 4, 2010 (Tr. 277-280).  Howlett reported on this occasion that she had first been treated at Seven Counties at age 13 when she received a diagnosis of depression (Tr. 277).  Her chief complaints on evaluation in 2010, were poor sleep, decreased appetite, depression, irritability, and anxiety (Id.).  Howlett confirmed that she has never received in-patient treatment in a psychiatric hospital (Id.).  At that time, Howlett reported poor concentration, frequent mood swings and irritability, but denied any phobias or paranoia.  She reported feelings of hopelessness, obsessive thoughts about the past and racing thoughts.

Howlett explained to Brotzge on evaluation that her father was very emotionally and verbally abusive and that she "constantly hears his voice in her head telling her how inadequate she is…."  (Tr. 277).  She acknowledged having been raped twice as a teenager. (Id.).  Although Howlett reported some suicidal thoughts, she told Nurse Practioner Brotzge that she has never attempted suicide (Tr. 278).  Howlett reported to Brotzge that she had recently quit working at UPS "because she did not have transportation to get there."  (Tr. 279).  She admitted to some problems in school with being distracted, but denied ever being diagnosed with attention deficit disorder.

A mental status examination by Nurse Brotzge revealed Howlett to be appropriately dressed with good eye contact, but with a depressed mood and affect.  Howlett's concentration was noted to be good and her language and thoughts were within normal limits, although she did exhibit some slight paranoia (Tr. 279).  Howlett discussed "hearing her father's voice whenever

8

she tries to do something herself, telling her that she is stupid and she can't do it." (Id.). She also reported hearing a whispering voice that she does not understand (Id.). Based on Howlett's statements, history and mental status examination, Nurse Brotzge diagnosed Howlett with PTSD and mood disorder with a GAF of 45 (Id.).

Howlett received two consultative examinations in September of 2010 (Tr. 260-266, 269-272). Dr. Mehmet Akaydin, Jr., performed the consultative physical examination of Howlett in Louisville, Kentucky, on Sept. 1, 2010 (Tr. 260). On reporting for examination, when asked why she was there, Howlett explained that she had "a lot of anger problems" and that "I never applied for this, Seven Counties applied for me." (Id.). No medical records were available for Dr. Akaydin to review on that occasion.

A review of Howlett's systems was unremarkable according to the doctor, with Howlett advising that "I feel fine." (Tr. 261). She denied any current or recent chest pain or severe musculoskeletal discomfort of any kind (Id.). Physical examination was reported by Dr. Akaydin to be unremarkable "for any overt limiting physical, neurological or orthopedic deficits of any kind." (Tr. 265). The doctor found Howlett to be "<u>extremely</u> healthy, vibrant, vigorous and fit … with fully intact upper and lower extremity functioning bilaterally." (Tr. 265-266)(original emphasis). At most, her range of motion appeared to be only slightly limited in the lumbar spine; otherwise, Howlett exhibited a full range of motion in all joints. (Tr. 264). Accordingly, Dr. Akaydin concluded that Howlett "should not have difficulty whatsoever performing all forms of relatively sedentary 'sit-down' type work as long as she has the appropriate training/instruction and motivation/encouragement to do so…." (Tr. 266).

Jessica M. Huett, Psy.D., performed a consultative mental examination of Howlett in Louisville the following week on Sept. 7, 2010 (Tr. 269-272). Howlett's chief complaint on

reporting for examination on that occasion was scoliosis (Tr. 269). At the time of the examination, Howlett had been undergoing treatment with Seven Counties Services for approximately a year and was being treated with Abilify, Trazodone and Citalopram. Contrary to her initial examination at Seven Counties, Howlett reported to Dr. Huett a single inpatient psychiatric hospitalization at age 16 (Tr. 270). Howlett reported irregular sleep and appetite, along with avoidance of people (Id.). Mental status revealed variable concentration, normal memory capacity and normal attention (Id.). Howlett displayed a restricted affect and mood, which she reported to be sad and depressed (Tr. 270). She related a history of two suicide attempts at age 16, contrary to her report to Nurse Brotzge (Tr. 271, 278).

Howlett reported often being angry, but denied any decrease in sleep or elevated moot to Dr. Huett (Tr. 271). Her fund of knowledge was found to be average, and her thought content appropriate to her mood. Howlett reported that she "used to hear voices of a demon" when she was 16 or 17 (Id.). Her judgment was noted to be adequate and she appeared capable of normal decision making, although her capacity for abstraction was "somewhat concrete." (Id.). Howlett told Dr. Huett that she had never been fired from a job, but she "does not like the work…." When asked why she would have difficulty working, Howlett "said it was nothing." (Id.).

Dr. Huett diagnosed Howlett with mood disorder, scoliosis by report with a current GAF of 55 (Tr. 271). Dr. Huett concluded in her summary that Howlett's ability to understand, remember and carry out instructions for simple repetitive tasks is not affected (Tr. 272). Her ability to tolerate the stress and pressure of day-to-day employment is moderately limited as is her ability to sustain attention and concentration for the performance of simple, repetitive tasks, along with her ability to respond appropriately to supervision, co-workers and work pressures in a work setting (Id.).

Four months after the consultative mental examination with Dr. Huett, Robert S. Watson, Psy.D., a licensed clinical psychologist performed a separate psychological examination of Howlett. (Tr. 296-299). Howlett was referred for examination by the Legal Aid Society for "diagnostic clarification related to her pursuit of qualifying for disability benefits." (Tr. 296). As part of his examination, Dr. Watson administered the Kaufman Brief Intelligence Test, Peabody-Picture Vocabulary Test, Hopelessness Scale and Depression Inventory, Manifest Anxiety Questionnaire, Multi-Axial Diagnostic Inventory, Trauma Symptom Inventory and Adult Clinical and Personality Scales (Id.).

On appearing for examination, Howlett related a history of depression and anxiety associated with past trauma. She reported auditory and visual hallucinations in the past, but related that her medication had reduced her visual hallucinations. Howlett also reported nightmares, hyper vigilance and exaggerated startled response, along with social withdrawal, irritability and fatigue (Tr. 296). Otherwise, her only reported physical medical concern was scoliosis.

Howlett appeared to Dr. Watson to be cooperative but somewhat anxious (Tr. 297). She put forth a genuine effort and was able to complete all tasks in a timely manner and was oriented without unusual speech or behavior (Id.). The Kaufman Intelligence Test revealed an IQ composite score of 65 "which ranked at or below the first percentile for her age placing her in the low extreme of intellectual functioning." (Id.). She obtained a score of 55 on the Peabody Picture Vocabulary Test, which placed her below the 1 percentile level and was suggestive of cognitive impairment (Id.). The results of the anxiety inventory and manifest anxiety questionnaire indicated an extreme level of psychological anxiety secondary to her family

background and exposure to trauma (Id.).  Results on the Bender Gestalt exam revealed evidence of inattention and mild neurological dysfunction.

Dr. Watson's clinical summary showed Howlett to have characteristics of significant anxiety and depressed mood with evidence of chronic and acute depression "that may at times involve auditory hallucinations and paranoia."  (Tr. 298).  The doctor also found significant evidence of personality dysfunction and possible mild mental retardation, although he felt that other factors such as medication and emotional functioning impaired her cognitive performance. Accordingly, Dr. Watson's diagnostic impression was major depression, recurrent, severe with psychotic features, post-traumatic stress disorder and personality disorder (Id.).  He assessed a current GAF of 40 and recommended continued outpatient psychotherapy and use of anti-depressant medication to address her anxiety and depression.  He concluded his report with the observation that the nature and severity of Howlett's emotional difficulties "suggest that she will have difficulty finding and maintaining adequate employment."  (Tr. 299).

The following year on Jan. 12, 2012, licensed clinical social worker Heidi Solarz-Kutz prepared a medical source statement of Howlett's ability to do work-related activities (mental) (Tr. 301-02).  In the source statement, Solarz-Kutz found that Howlett had a good ability to adhere to basic standards of cleanliness and a fair ability to understand and remember detailed instructions, work with others without distraction, complete a normal workday, ask simple questions, get along with co-workers, be aware of normal hazards, and set realistic goals (Tr. 301-02).  Otherwise, Solarz-Kutz found that Howlett had a poor, or no useful ability, to: remember work-like procedures; remember sort, simple instructions; carry out such instructions; carry out detailed instructions; maintain attention for extended periods; perform activities within a schedule; sustain routine without supervision; make simple work-related decisions; or perform

at a consistent pace (Tr. 301). Solarz-Kutz also found Howlett to have poor, or no useful ability, to: interact appropriately with the public; accept instructions or criticism from supervisors; respond appropriately to changes in the workplace; or, travel to unfamiliar places or use public transportation (Tr. 302). As support for her assessment, Solarz-Kutz wrote only "Individual therapy as well as mental health evaluation." (Id.).

Examination of Howlett's treatment records from Seven Counties Services reveals that after her initial psychiatric evaluation in January of 2010 (Tr. 277-280), Howlett did not reappear for treatment until late 2010 (Tr. 282-293). Howlett apparently failed to appear for a therapy appointment on Sept. 27, 2010, and again on Nov. 5, 2010 (Tr. 293). She did receive treatment on Nov. 8, 2010, at which time she reported her sleep and appetite to be poor (Tr. 291). Her diagnosis on medication remained PTSD and mood disorder. Howlett at that time was being treated with medications that included Celexa, Trazadone, Ability and Neurontin (Tr. 281-291).

She returned to Seven Counties for therapy with Nurse Practitioner Brotzge on Nov. 29, 2010 (Tr. 289). Again, Howlett reported her sleep, appetite and mood to be poor (Tr. 289). Treatment notes reflect that her diagnosis of PTSD and mood disorder, and assessment remained unchanged (Id.). Howlett's medications on that occasion were noted to be Ability and Neurontin.

Social worker Solarz-Kutz assessed Howlett's problems as of Dec. 6, 2010, to be depression and anger/impulse control (Tr. 285). Howlett reported that she was "doing better" and was not crying as much. Her mood appeared euthymic with congruent affect (Tr. 286). Howlett continued to report difficulty sleeping, decreased appetite, and bouts of anger, irritability and depression (Id.). Her treatment plan that December consisted of individual therapy and

medication with the goal of decreasing her depression and improving her impulse control (Tr. 282-83).

Howlett received mental health treatment at Seven Counties Services throughout 2011. During her appearance in January, Howlett reported that she remained homeless. Her appetite was poor, and her daughter was getting on her nerves (Tr. 326). Her diagnosis of PTSD and mood disorder remained unchanged. Her medication was altered to begin Wellbutrin XL (Tr. 326).

Howlett failed to appear for her scheduled appointment the following month in February of 2011 (Tr. 325). She returned two months later on March 11, 2011, at which time she reported that she was doing "okay," that her sleep was "fair," and her appetite "unchanged." (Tr. 323). Her medications remained Abilify, Neurontin and Wellbutrin XL (Id.). Otherwise, Howlett reported only having daily headaches (Id.).

Howlett again missed her scheduled appointment in April of 2011 (Tr. 322). She returned the following month in May that year, reporting that she had run out of medication because she missed the prior appointment (Tr. 320). Howlett advised that she was attempting to attend Jefferson Community College and had gotten her own apartment, but her appetite remained poor and her sleep only fair (Id.). Her diagnosis and medications on that occasion remained unchanged (Id.)

. No records exist for June of 2011. The next treatment notes for Howlett at Seven Counties Services are dated July 13, 2011 (Tr. 318-19). On that occasion, Howlett reported that she was "doing okay," that her sleep and appetite were "fair," and that she was "stressed because she's trying to find a job." (Id.). Her diagnosis remained unchanged, although Howlett's medication was altered to include Seroquel XR (Tr. 318).

Howlett returned to Seven Counties Services on Aug. 12, 2011, for further treatment with Nurse Practitioner Brotzge (Tr. 316).  Howlett reported to Brotzge that she was sleeping better on Seroquel XR, that her appetite was fair, and that she was working at Audubon Hospital in the dietary department and liked her work "okay."  (Id.).  The assessment on that occasion was "improved."  The following month, however, Howlett reported to Brotzge that she was "not doing well."  (Tr. 314).  Howlett indicated that her medication does "work some," but that she was worrying a lot and did not want to "be here anymore." (Tr. 314).  Brotzge recommended an increase in Howlett's Seroquel XL, counseling with a mental health therapist and working to get Howlett into a "day program."  (Id.).

Howlett did not appear for her scheduled appointments in October, November and December of 2011 (Tr. 313).  On Dec. 16, 2011, Erica Crawford, the principal case manager for Howlett's case at Seven Counties Services, prepared a master problem list (Tr. 310).  Crawford identified problems of depression, anger management, poor appetite and history of prior rape-related trauma (Id.).  An adult treatment plan prepared that same month noted Howlett's problem to be depression characterized by reports of poor sleep and appetite, anxiety, decreased concentration, and increased anger and impulsive behaviors (Tr. 311).  Interventions to address these problems included medication management, individual therapy and adult case management (Tr. 311-12).  This master treatment plan, however, was not signed by Howlett or Nurse Practitioner Brotzge (Tr. 312).

Issues Presented.

Howlett in her fact and law summary objects to findings of fact nos. 2, 4, 8, 9 and 10 of ALJ Price's hearing decision (DN 12) (Tr. 21-28). With regard to finding no. 2, Howlett argues that the ALJ erred in failing to find that she has a severe impairment of PTSD. Howlett notes that both Dr. Watson in his consultative mental examination and the Seven Counties Services in the treatment notes of Nurse Practitioner Brotzge diagnosed PTSD (Tr.278-79, 296-98). This failure according to Howlett detracts from the conclusion that substantial evidence supports the decision of ALJ Price that denied her SSI claim.

Howlett's argument that the ALJ overlooked one of her severe impairments focuses on step 2 of the sequential evaluation process. Step 2 and its requirement of a severe impairment exists to eliminate those claims that involve at most a slight abnormality that has no significant effect on the ability of a claimant to perform work. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *Farris v. Sec'y*, 773 F.2d 85, 89-90 (6th Cir. 1985) (Step 2 of the evaluation process is an administrative convenience for screening out totally groundless claims). By regulation a "severe" impairment is one that significantly limits the ability of a claimant to do basic work activities, which include the ability and aptitude necessary to do most jobs. See 20 C.F.R. §§416.920(c), 416.921(b). As the Commissioner correctly notes, however, the mere diagnosis of a condition does not thereby establish its severity. *Higgs*, 880 F.2d at 863; SSR 96-8p, 1996 WL 374184 at *2-3 (1996) (The functional limitations caused by a claimant's impairment are what establishes the severity of those impairments at step 2).

Further, the failure of the Commissioner to find a particular impairment to be severe, contrary to the cited regulations and decisions, may nonetheless constitute harmless error. *See Maziriaz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987). The Commissioner is required by

regulation to consider all of a claimant's impairments, both the severe and non-severe, when determining the residual functional capacity (RFC) of the claimant. See 20 C.F.R. §416.945 ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§404.1520(c), 404.1521 and 404.1523, when we assess your residual functional capacity."); 20 C.F.R.§416.923 (the combined effects of severe and non-severe impairments will be considered throughout the disability process without regard to whether any impairment would be sufficiently severe itself to establish disability).

Here, ALJ Price in his hearing decision evaluated both the severe and non-severe nonexertional impairments of the claimant in determining her RFC for a limited range of light work in finding of fact no. 4 (Tr. 22-26). In particular, ALJ Price found Howlett to be limited to simple, one-to-two step jobs in an object-focused work setting that is low stress with little to no change and no production quota, with only occasional contact with supervisors or co-workers and no close tandem work or contact with the general public. Id. (Tr. 22-23). Because ALJ Price continued his analysis through the sequential evaluation process and considered all of Howlett's impairments, severe and non-severe, in determining her RFC, the possible failure to find her PTSD to be a severe impairment was harmless error at worst. *See McGlothin v. Comm'r of Soc. Sec.*, Case No. 07-4355, 2008 WL 4772077 at *6 (6th Cir. Oct. 31, 2008).

Howlett next challenges the RFC finding contained in ALJ Price's adverse hearing decision at finding of factno.4. As noted above, ALJ Price found in this finding that Howlett remains capable of performing a restricted range of light work limited to simple, one-to-two step jobs in an object-focused work setting with low stress and little to no change or production quotas and only occasional contact with supervisors but no close tandem work or contact with

the general public (Tr. 22-23). Howlett now contends that the ALJ erred in several respects at finding no. 4.

In particular, she maintains that his characterization of her mental health treatment as being "on and off" and "limited" is inaccurate. She also questions the ALJ's credibility determination based on her alleged failure to seek regular treatment given her mental impairments based on *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). According to Howlett, Seven Counties Services found no problem with her treatment attendance and she attended nine separate appointments in 2011, resulting in a yearly assessment comment, as of December that year, that she "actively participates in treatment/accepts responsibilities." (Tr. 307). Howlett further protests that ALJ Price, in reviewing her treatment records from Seven Counties Services, selectively extracted only those portions of the treatment notes that contain findings supportive of his decision to deny benefits, while ignoring those findings contrary to such a result. In doing so, Howlett concludes that ALJ Price has run afoul of the requirement that he examine the record as a whole, taking into account those portions that fairly detract from his decision as required by *Tyra v. Sec'y*, 896 F.2d 1024, 1028 (6th Cir. 1990). *See also*, *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000).

In particular, Howlett complains that the ALJ completely failed to address the diagnostic findings of Dr. Robert Watson, a licensed clinical psychologist (Tr. 296-99). Howlett maintains that these findings, which were based on objective psychological testing, as opposed to those of Dr. Huett, detract from the ALJ's conclusion that she is not disabled. At most, according to Howlett, the ALJ's hearing decision makes only two brief, passing references to Dr. Watson's report to her restricted affect, mood and facial expressions and her GAF score. (Tr. 24, 26).

Otherwise, ALJ Price made no mention of Dr. Watson by name, or the significant diagnoses obtained by him based on her psychological test results, which include major depression, recurrent severe with psychotic features, and PTSD (Tr. 298).

Dr. Watson additionally noted that she experienced auditory hallucinations and paranoia, findings that the ALJ also failed to mention in his hearing decision (Tr. 298). Most importantly, ALJ Price made no mention of Dr. Watson's concluding statement that Howlett appeared to have significant emotional difficulties that would likely interfere with her ability to function socially and in a work environment (Tr. 298). According to Howlett, the omissions of these critical findings by Dr. Watson undercut any possibility that ALJ Price's adverse hearing decision is supported by substantial evidence. These findings of Dr. Watson in Howlett's view are strongly supported by the treatment notes of Nurse Practitioner Brotzge, who noted that Howlett constantly hears voices in her head, has nightmares concerning rape, along with flashbacks (Tr. 277-79).

Howlett continues to argue that the findings contained in her Seven Counties Services mental status examinations, when viewed in their entirety, rather than selectively, further support her SSI claim. She cites in particular findings of slight paranoia, poor sleep and appetite and auditory hallucinations, along with psychomotor retardation, flat affect, sad mood, somatic preoccupation and disorganized thought patterns - - all findings that ALJ Price omitted from his hearing decision, according to Howlett (Tr. 288, 305). In Howlett's words, "the great majority of mental status examination findings do not support the ultimate conclusion of the ALJ that she remains capable of performing a limited range of light exertional work with certain restrictions."

Howlett challenges the credibility finding of the ALJ, as well. She maintains that her failed efforts to perform part-time work following the alleged onset date of her disability are not

support for the adverse credibility finding of ALJ Price.  The ALJ's credibility findings in this respect are not entitled to any weight she contends because the inability of a claimant to perform substantial gainful activity is not logically evidence that he or she *can* perform it.  As for the ALJ's reference to her adult function report (TR 178-86), Howlett contends that the ALJ again simply omitted from his decision those adverse portions related to her mental limitations, while focusing only on her physical abilities, which are not put at issue.  The ALJ's reliance on the consultative examination reports of Dr. Akaydan, Dr. Huett and the non-examining state agency doctors is completely undercut, in Howlett's view, by the failure of the ALJ to resolve the conflicts that arise from the mental status examination notes obtained during her treatment at Seven Counties Services, which repeatedly show persistent symptoms of severe depression and PTSD (DN 12, p. 7).

Howlett also claims that ALJ Price has mischaracterized Nurse Practitioner Brotzge as being a social worker.  In fact, Brotzge's ongoing treatment of Howlett's severe mental condition indicates to Howlett that Brotzge's mental status examination findings should be given significant weight rather than summarily and erroneously dismissed based on a mischaracterization of her professional status.[2]  Once again, Howlett insists that the findings obtained by consultative mental examiner Dr. Watson and treating Nurse Practitioner Brotzge are in complete accord with one another, yet were either ignored or improperly dismissed by the ALJ without adequate consideration.  Consequently, Howlett concludes that the decision of ALJ Price, that she remains capable of performing a limited range of light work to include such jobs

---

[2]  Howlett is mistaken to the extent she argues that the ALJ mischaracterizes Brotzge as being a social worker.  The ALJ appears to be referring to Heidi Solarz-Kutz, the social worker who completed the medical source statement of ability to do work-related activities (mental).  (Tr. 301-02).

as garment sorter, mailroom clerk and plastics packager, is not supported by substantial evidence so that the Commissioner failed to carry her burden at step 5 of the sequential evaluation process.

**Finding of Fact No. 4**

We begin our discussion of these arguments with a review of the standard for establishing the residual functional capacity of a claimant for social security benefits. Residual functional capacity is defined by regulation as being "the most you can still do despite your limitations." 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1). *See Luteyn v. Comm'r of Soc. Sec.*, 528 F. Supp.2d 739, 750 (W.D. Mich. 2007) ("RFC is the most, not the least, a claimant can do despite his impairments."). The Commissioner is required by regulation to assess a claimant's RFC "based on all the relevant evidence in [the claimant's] … record." *Id. See Bingham v. Comm'r*, 186 Fed. Appx. 624, 647-48 (6th Cir. 2006) ("The ALJ is ultimately responsible for determining a claimant's RFC based upon relevant medical and other evidence of record.").

In assessing a claimant's residual functional capacity, the Commissioner will consider all of his or her medically determinable impairments including both severe and non-severe impairments. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). *See Reynolds v. Comm'r* , 424 Fed. Appx. 411, 417-18 (6th Cir. 2011) ("It is true that an ALJ must determine a claimant's residual functional capacity, considering 'numerous factors' including 'medical evidence, non-medical evidence, and the claimant's credibility.'") (quoting *Coldiron v. Comm'r*, 391 Fed. Appx. 435, 443 (6th Cir. 2010)). See also, SSR 96-5p, 1996 WL 374183 at *3 (July 2, 1996). It is the responsibility of the claimant to provide the evidence that the Commissioner will evaluate in making the RFC finding. See 20 C.F.R. §§404.1512(c), 416.912(c). The Commissioner also will consider any statements of the claimant provided by medical sources about what he or she

remains able to do, as well as any descriptions or observations of the claimant's limitations caused by his or her impairments that are provided by the claimant, the claimant's family, friends or other persons. 20 C.F.R. §§405.1545(a)(3), 416.945(a)(3).

A finding of residual functional capacity is used at step 4 of the sequential evaluation process first to determine whether the claimant remains capable of performing his or her past relevant work. See 20 C.F.R. §§404.1520(f), 404.1560(b), 416.920(f) and 416.960(b). If the Commissioner determines that a claimant is not able to perform his or her past relevant work, or does not have past relevant work, then the RFC determination is used at step 5 of the sequential evaluation process to determine whether the claimant can adjust to any other work that exists in the national economy. See 20 C.F.R. §404.1520(g), 404.1566, 416.920(g) and 416.966. In this respect, the RFC assessment is used along with information concerning the claimant's vocational background in making the disability determination. *Id.*

Examination of the administrative record persuades the Court that substantial evidence, in fact, does support the RFC determination of ALJ Price. (Tr. 22-26). ALJ Price properly accorded substantial weight to the opinion of consultative examining psychologist Dr. Huett (Tr. 269-72). Dr. Huett in her report diagnosed Howlett with mood disorder (Tr. 271). Despite this diagnosis, Dr. Huett determined that Howlett's speech was normal, its content was appropriate, that her fund of knowledge was average and her judgment adequate (Tr. 271). Howlett appeared to Dr. Huett to be capable of normal decision making (Id.). Notably, when Dr. Huett asked Howlett why she would have difficulty working, Howlett responded, "It was nothing." (Tr. 271). Howlett further advised Dr. Huett, as noted in the report, that Howlett has never been fired from a job, "but does not like to work, and to be organized and has an attitude." (Id.).

ALJ Price in his hearing decision at p. 7 correctly notes that Dr. Huett found that Howlett has no limitation in her ability to perform simple tasks and only moderate limitation in her ability to sustain attention and concentration, respond to co-workers and supervisors and work stress or pressure (Tr. 25). Such findings are directly supportive of the RFC determination of ALJ Price and are adequately supported by the record as well. For example, Dr. Huett's consultative examination results also are supported by the opinions of state appointed psychologists Lea Perritt, Ph.D. (Tr. 97-99) and Jay Athy, Ph.D. (Tr. 108-112).

Drs. Perritt and Athy, based on their review, found that Howlett is moderately limited in her ability to: understand and remember detailed instructions and work-like procedures; carry out such detailed instructions; maintain attention and concentration for extended periods; maintain ordinary routine without special supervision; work in coordination or in proximity to others without distraction; and, perform at a consistent pace without interruption due to psychologically based symptoms (Tr. 97-98, 110-111). Likewise, both Drs. Perritt and Athy concluded that Howlett was only moderately limited in her ability to: interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distraction; maintain socially appropriate behavior; respond appropriately to changes in the work setting; and, set realistic goals or make plans independently (Tr. 98, 111). In both instances, the state agency psychologists supported their conclusions with Howlett's educational history as a high school graduate and part-time college student, her history of prior employment and her activities of daily living, which along with the consultative examination results obtained by Dr. Huett, "do not indicate marked mental limitations." (Tr. 98, 111).

While neither Dr. Perritt nor Dr. Athy was an examining expert, such non-examining state-appointed psychologists remain medical experts whose opinions are to be accorded appropriate weight. See 20 C.F.R. §419.927(e)(2) (state agency psychologists are highly qualified physicians who are also experts in Social Security disability evaluation); SSR 96-6p, 1996 WL 374180 at *1 (1996). *See gen., Norris v. Comm'r*, 461 Fed. Appx. 433, 439 (6th Cir. 2012) (ALJ properly credited the opinions of state-agency physicians over that of one-time consultative examiners where the non-examining physician's assessments were more consistent with the record) (citing *Ealy v. Comm'r*, 594 F.3d 405, 414-15 (6th Cir. 2010)). Based on the consultative examination results of Dr. Huett and the opinions of the state-agency psychologists, ALJ Price appropriately relied on these medical experts to conclude in finding of fact no. 4 that Howlett retains the RFC to perform simple, one-to-two step jobs in an object focused work setting that is low stress, has little to no change and no production quota with only occasional contact with supervisors and co-workers, but no close tandem work or contact with the general public (Tr. 22-23).

Howlett's claims that ALJ Price did not adequately consider the consultative examination report of psychologist Robert Watson (Tr. 296-99) are understandable, but are not controlling. The hearing decision of the ALJ includes at most only brief reference to that portion of Dr. Watson's report in which he notes Howlett's restricted affect, mood and facial expression (Tr. 24) (citing Exhs. 4f, 6f and 9f).[3] Later in the hearing decision, ALJ Price again makes brief reference to the GAF scores contained in the treatment records of Seven Counties Services and the consultative report of Dr. Watson (Tr. 26) (citing Exhs. 6f, 9f and 11f). It is therefore clear

---

[3] Dr. Watson's consultative examination report is contained in Ex. 9f.

that ALJ Price was aware of and did consider the psychological evaluation performed by Dr. Huett in January of 2011 (Tr. 296, 299).

Howlett is correct, nonetheless, that ALJ Price did not further discuss the findings of Dr. Watson, in particular his diagnosis of major depression, recurrent, severe with psychotic features, and PTSD (Tr. 298). ALJ Price likewise did not address the portion of Watson's report in the summary and recommendations section whereat he opines that given the nature and severity of Howlett's emotional difficulties "she will have difficulty finding and maintaining adequate employment." (Tr. 299). It therefore is true that ALJ Price did not fully explain the basis for rejecting Dr. Watson's latter opinion or for according more weight to the findings of Dr. Huett and those of state agency psychologists Perritt and Athy (Tr. 97-99, 108-112).

This omission by ALJ Price is not a basis on which to reject the hearing decision per se. An ALJ is not required to explain his or her reasons for rejecting the opinion of a non-treating source. *Norris*, 461 Fed. Appx. at 439 ("Moreover, an ALJ need only explain its reasons for rejecting a treating source because such an opinion carries 'controlling weight' under the SSA. *See Smith*, 482 F.3d at 876.") *See Smith v. Comm'r*, 482F.3d 873, 876 (6th Cir. 2007) ("In the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not accepting the reports."); *Burton v. Astrue*, 2013 WL 85073 at *6 (E.D. Ky. Jan. 7, 2013) (ALJ not required to state good reasons for rejecting the opinions of consultative examiners who are not treating physician). Consequently, Howlett's dissatisfaction with the absence of an adequate explanation by ALJ Price for his decision to reject the findings of consultative psychological examiner Dr. Watson, is not a basis itself to remand the decision of the Commissioner.

To the extent that Dr. Watson offers the opinion that Howlett will have difficulty obtaining and sustaining employment, his opinion, in effect, is merely a conclusion that Howlett is "disabled" or is "unable to work." Such opinions are the exclusive responsibility of the Commissioner. See 20 C.F.R. §416.927(d); *Warner v. Comm'r*, 375 F.3d 387, 391 (6th Cir. 2004) (The determination of disability is ultimately the prerogative of the Commissioner). Further, the diagnosis assessed by Dr. Watson in his report (Tr. 298) did not result in the doctor imposing any work-related, non-exertional limitations on Howlett. At most, Dr. Watson states generally that she has "significant emotional difficulties that are likely to interfere with her ability to function both socially and in the work environment." (Id.). This conclusion is not a determination of whether Howlett has slight, moderate or marked limitations in her ability to understand and remember, sustain concentration and persistence, engage in social interaction and adequately adapt to the work environment.

It is noteworthy that Howlett apparently did not believe that her "emotional difficulties" would preclude employment. Indeed, when directly asked, she was unable to state any reason why she could not adequately perform substantial gainful activity during her consultative examination by Dr. Huett. Howlett did continue to work after the alleged onset of her disability. Further, her statements during treatment at Seven Counties Services indicated that she continued to look for employment, and contrary to her hearing testimony, ceased employment at UPS not due to any physical or mental limitations arising from her impairments, but rather simply due to a lack of transportation. (Tr. 279).

While there are indeed occasional references to auditory hallucinations and suicidal thoughts, examination of the record as a whole, including the treatment records and mental status examination notes from Seven Counties Services reveals that such hallucinations were isolated,

remote in time, and related directly to memories of her father's psychological abuse. The record indicates that Howlett, at most, apparently made two unsuccessful attempts at suicide in her mid-teens at approximately age 16. She had no current suicide attempts immediately prior to or after her alleged onset date.

As the ALJ correctly noted, her attendance for mental health treatment at Seven Counties Services was irregular at best. Although Howlett was initially evaluated in January of 2010, by psychiatric Nurse Practitioner Brotzge, she did not return for treatment for approximately 9 months in September of that year (Tr. 277-280, 293). Her attendance for mental health services at Seven Counties Services in 2011, also was irregular with Howlett missing 5 of her monthly treatment sessions in 2011 (Tr. 303-329). Not only did the ALJ properly take this history into account in his evaluation of the intensity and persistence of Howlett's symptoms, such history runs contrary to the severity of the findings obtained by Dr. Watson based on his consultative examination.

Under these circumstances, an order of remand based on the alleged failure of ALJ Price to adequately explain why he rejected the conclusions of Dr. Watson would, as the Commissioner points out, be a waste of judicial and administrative resources given that the record as a whole adequately supports the ultimate decision in this case. *See Ward v. Comm'r*, 211 F.3d 652, 656 (1st Cir. 2000) (remand is not required if it would be no more than an empty exercise); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (a remand in search of a perfectly written opinion is not required where the only reason for remand is when a different result may be obtained thereby).

The Court also agrees that ALJ Price did not err in his decision to give little weight to the GAF scores obtained by Dr. Watson and Seven Counties Services (Tr. 298). These GAF scores

at most reflect the opinion of the assessor and may have little or no bearing on the social and occupational functioning of the claimant. No particular amount of weight is required to be placed on a GAF score. *See Johnson v. Comm'r*, 535 Fed. Appx. 495, 508 (6th Cir. Oct. 15, 2013); *Howard v. Comm'r*, 276 F.3d 235, 241 (6th Cir. 2002) (A GAF is not essential to the accuracy of an RFC). Accordingly, while a GAF score of 41-50 may indicate serious symptoms, the refusal of the ALJ to adopt Dr. Watson's GAF assessment or that of social worker Heidi Solarz-Kutz as being determinative is not itself a basis on which to upend the hearing decision. *See Smith v. Comm'r*, 482 F.3d 873, 877 (6th Cir. 2007) (A GAF score in the high 40s to mid-50s did not preclude the claimant from having the mental capability to engage in substantial gainful activity); *Kornecky v. Comm'r*, Case No. 04-2171, 2006 WL 305648 at *13-14 (6th Cir. Feb. 9, 2006) ("We are not aware of any statutory, regulatory or other authority requiring the ALJ to put stock in a [GAF] score in the first place.").

Howlett's claim that ALJ Price failed to properly evaluate the medical source statement (mental) prepared by social worker Heidi Solarz-Kutz is likewise rejected by the Court. Ms. Solarz-Kutz is a social worker, not an acceptable medical source. See 20 C.F.R. §416.913(a). Consequently, her opinion may properly be accorded little weight, particularly where little objective basis is offered to support it and it is contradicted by the longitudinal medical records. See gen., SSR 06-03p 2006 WL 2329938 at *6 (2006); SSR 96-5p, 61 Fed. Reg. 34471, 34473 (1996). Because the opinion of social worker Solarz-Kutz was properly found by the ALJ to be inconsistent with the opinions of psychologist Huett, Perritt and Athy, the ALJ did not err in placing little weight on Solarz-Kutz's opinion that Howlett has virtually no useful ability to understand, remember and carry out instructions, and respond appropriately to supervision, co-workers and work pressures in a work setting (Tr. 301-02). The extraordinary restrictions

assessed by Solarz-Kutz in the medical source statement that she prepared (Tr. 301-02) not only are unsupported by reference to any specific medical/clinical findings, but are contradicted by Howlett's educational and work history, as well. No other source in the record places such extraordinarily severe limitations on Howlett.

This brings the Court to the ALJ's evaluation of Howlett's credibility as it relates to her subjective complaints regarding her symptoms. An administrative law judge properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal courts will accord "great deference to that credibility determination." *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004). The standard in the Sixth Circuit for evaluating subjective complaints, such as complaints of pain for example, was established in *Duncan v. Sec'y of H&HS*, 801 F.2d 847, 853 (6th Cir. 1986). *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (setting forth the *Duncan* standard).

Under *Duncan*, the Court first determines whether objective medical evidence of an underlying medical condition is present in the record. *Id*. If so, then the Court will examine whether such evidence confirms the severity of the claimant's subjective symptoms related to the condition, or whether the objectively established medical condition itself is of sufficient severity that it can be reasonably expected to produce the alleged subjective symptoms, such as disabling pain. *Id*. The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight and deference given the ability of the ALJ to observe the demeanor and credibility of the witnesses. *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)). Yet, the ALJ is not accorded absolute deference and his or her assessment of a claimant's credibility must be supported by substantial evidence. *Beavers v. Sec'y*, 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant. *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters*, 127 F.3d 525, 531 (6th Cir. 1997)). The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility." *Id*. (citing *Rogers*, 486 F.3d at 247) (citing SSR 96-7p)). Under SSR 96-7p, the ALJ must in the hearing decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight. *Winning*, 661 F. Supp.2d at 823. A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p. *Id*. (citing *Rogers*, 486 F.3d at 248).

An assessment of the claimant's credibility must be based on a consideration of all the evidence of record. It should include consideration of not only the objective medical evidence but the following factors as well: (1) the daily activities of the claimant; (2) the location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the claimant has received for relief of his or her symptoms; (6) any measures other than treatment that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the functional limitations and restrictions of the claimant due to such symptoms or pain. *Id*. at 823 n. 14 (citing SSR 96-7p). Also included among the evidence that the ALJ must consider are the medical signs and laboratory findings of record, the diagnosis, prognosis and medical opinions provided by any treating physicians or other medical sources, and any statements or reports from the claimant,

physicians or other persons about the claimant's medical history, treatment, response to treatment, prior work record, daily activities and other information related to the symptoms of the claimant and how such symptoms affect his or her ability to work. *Id.*

When the record establishes consistency between the subjective complaints of the claimant and the other evidence of record, such consistency will tend to support the credibility of claimant, while in contrast, any inconsistency in this regard will tend to have the opposite effect. *Winning*, 661 F. Supp.2d at 823. The reviewing court does not make its own credibility determinations. *Franson v. Comm'r*, 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing *Walters*, 127 F.3d at 528)). The federal courts will not substitute their own credibility determination for that of the ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to decide questions of credibility." *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)). Given the substantial deference accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's credibility determination face an uphill battle.'" *Franson*, 556 F. Supp.2d at 726-27 (citing *Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

Here, ALJ Price properly determined that while Howlett's medically determinable impairments reasonably could be expected to produce her alleged symptoms, the intensity, persistence and limiting effect of those symptoms, as alleged by Howlett in her subjective statements, was not entirely credible (Tr. 24). Howlett's mental health treatment history, as ALJ Price correctly noted, did not reveal consistent treatment through Seven Counties Services. After her initial evaluation of Jan. 4, 2010, which occurred a mere three months before her alleged disability onset date of March 1, 2010, Howlett did not return for follow-up mental health

treatment until nearly nine months later in Sept. of 2010. (Tr. 24, 277, 293). Further, once she initiated treatment, Howlett missed repeated appointments with Seven Counties Services in 2011 (Tr. 24, 293, 313, 320, 322, 325). There is no indication, contrary to Howlett's suggestion, that these missed appointments were in any respect due to the severity of her mood disorder or PTSD symptoms. SSR 96-7p, 1996 WL 374186 at *8 (1996) (claimant's statement may be less credible if the frequency of treatment is inconsistent with the level of complaints); *Blacha v. Sec'y of HHS*, 927 F.3d 228, 231 (6th Cir. 1990) (claimant's failure to seek treatment undermines subjective complaints of disabling symptoms). Further, ALJ Price did not rely exclusively on these gaps in treatment to reject Howlett's SSI claim.

The objective medical evidence of record in the form of the opinions obtained by consultative examiner Huett and state agency psychologists Perritt and Anthy likewise constitutes substantial evidence that supports the credibility determination of the ALJ. The Commissioner also correctly notes in her fact and law summary that no treating physician has offered an opinion that supports Howlett's subjective complaints and related limitations (DN 13, p. 14). Indeed, Dr. Watson in his consultative psychological examination did not do so.

The activities of daily living reported by Howlett likewise support the credibility finding of ALJ Price (Tr. 22-23, 26, 157-60, 180-83). Howlett despite her impairments remains able to provide care for her minor child, is able to operate an automobile, shop, clean her apartment, prepare simple microwave meals, attend church regularly and engage in recreational reading. Howlett's education and work history, as noted, also undermine her subjective complaints. Howlett successfully completed high school and on two occasions briefly enrolled in college before withdrawing for reasons apparently unrelated to her nonexertional impairments. Her educational history reveals no special education classes. By Howlett's own admission, she has

never been discharged from employment. Instead, Howlett acknowledged to Nurse Brotzge that she ceased employment at UPS due to transportation difficulties, rather than any inability to perform the duties of her employment due to her nonexertional limitations as she testified at the administrative hearing.

The Court also has considered Howlett's argument that ALJ Price failed to consider her nonexertional impairments in combination with her exertional limitations when evaluating her subject symptomology (DN 12, pp. 8-9). Examination of ALJ Price's hearing decision, however, indicates that he recognized his responsibility to consider her impairments in combination (Tr. 20). In fact, the ALJ made reference to "a combination of severe physical and mental impairments" in evaluating the medical evidence to determine Howlett's residual functional capacity in his hearing decision at pp. 4-8 (Tr. 22-26). Based on the finding of the ALJ that Howlett did not have "an impairment or combination of impairments" that met or medically equaled a listed impairment at step 3, it may properly be inferred that ALJ Price considered Howlett's nonexertional and exertional impairments in combination. *See Gooch v. Sec'y HHS*, 883 F.2d 589, 590-92 (6th Cir. 1986).

In sum, examination of the hearing decision, in light of the entire record, causes the Court to conclude that ALJ Price properly determined Howlett's RFC in finding of fact no. 4. ALJ Price adequately discussed the evidence of record in reaching his RFC determination; and while Howlett may be dissatisfied with the extent of the ALJ's treatment of the unfavorable evidence, in particular the consultative examination report of Dr. Watson, the adverse decision at step four of the sequential evaluation process is nonetheless fully supported by substantial evidence.

ALJ Price determined at step 5 of the sequential evaluation process in finding of fact no. 9 that Howlett remains capable of performing alternative work that exists in substantial numbers

in the national economy.  Using the medical-vocational rules as a framework for decision making, in conjunction with the testimony of vocational expert Gail Franklin (Tr. 67-71), the ALJ identified specific alternative jobs of garment sorter, mailroom clerk and plastics packager that Howlett remains capable of performing given her age, education, past relevant work and residual functional capacity (Tr. 27-28).

When an ALJ bases his or her decision on the testimony of a vocational expert given in response to a hypothetical question that accurately portrays the claimant's limitation, the Commissioner has met her burden at step 5 of the sequential evaluation process.  *See Varley v. Sec'y HHS*, 820 F.2d 777, 779 (6th Cir. 1987).  Because ALJ Prices' hypothetical to the vocational expert included those functional limitations that the ALJ properly determined to be credible, and because vocational expert Franklin, using the same hypothetical, identified a substantial number of jobs that Howlett remains capable of performing, her claim for SSI benefits was properly denied.  Howlett failed to carry her ultimate burden to prove that she is disabled and substantial evidence supports the decision of ALJ Price that denied her SSI claim. For these reasons, the Court shall enter a final order dismissing her complaint with prejudice.

Cc:     Counsel of Record